# United States Court of Appeals for the Federal Circuit

---

**CAMELBAK PRODUCTS, LLC**
(SUCCESSOR-IN-INTEREST TO **CAMELBAK PRODUCTS, INC.**),
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2010-1420

---

Appeal from the United States Court of International Trade in case no. 05-CV-0249, Judge Delissa A. Ridgway.

---

Decided: June 16, 2011

---

ARTHUR K. PURCELL, Sandler, Travis & Rosenberg, P.A., of New York, New York, argued for plaintiff-appellant. With him on the brief was LARRY T. ORDET.

JASON M. KENNER, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellee. With him on the brief were BARBARA S. WILLIAMS, Attorney in Charge; and TONY WEST, Assistant

Attorney General, JEANNE E. DAVIDSON, Director, of Washington, DC.

———————————

Before BRYSON, CLEVENGER, and PROST, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* CLEVENGER.
   Dissenting opinion filed by *Circuit Judge* BRYSON.

CLEVENGER, *Circuit Judge*.

This customs case concerns the proper classification of ten styles of CamelBak Products, LLC's ("CamelBak") back-mounted packs ("subject articles").[1]  CamelBak appeals the judgment and decision of the United States Court of International Trade denying CamelBak's motion for summary judgment, granting the United States' (the "government") cross-motion for summary judgment, and holding that the merchandise at issue was properly classified as "travel, sports, and similar bags" under subheading 4202.92.30 of the Harmonized Tariff Schedule of the United States ("HTSUS").[2]  *CamelBak Prods., LLC v. United States*, 704 F. Supp. 2d 1335 (Ct. Int'l Trade 2010) ("*CamelBak*").  For the reasons set forth below, we reverse and remand the case for further proceedings.

I

The subject articles are imported back-mounted packs used for outdoor activities and athletics, including cycling, running, hiking and skiing, and are designed to deliver water to the user in a "hands-free" fashion, allowing the

————————————————

[1]    CamelBak markets the ten styles of merchandise at issue as "Ares," "Blow Fish," "Day Star," "H.A.W.G.," "Scout," "M.U.L.E.," "SnoDAWG," "SnoBound," "Isis," and "Ventoux."

[2]    References to the HSTUS and the General Rules of Interpretation throughout this opinion are to the 16th edition, published on December 30, 2003.

user to consume water on-the-go without having to inter-rupt activity.  Each of the subject articles is a textile bag with padded adjustable shoulder straps and features: (a) a polyurethane reservoir or bladder surrounded by a closed-cell polyethylene foam compartment designed to carry and maintain the temperature of water or another bever-age; (b) a hydration delivery system composed of flexible tubing attached to the reservoir, a bite valve and a shut-off valve; and (c) a cargo compartment designed to hold food, clothing, gear and supplies.  Each reservoir has a capacity of between 35 and 100 ounces of liquid, and each cargo compartment can accommodate between 300 and 1680 cubic inches, depending on the style of pack.

Between August 6, 2004 and August 27, 2004, U.S. Customs and Border Protection ("Customs") liquidated and classified the merchandise at issue under subheading 4202.92.30, HTSUS, as "Trunks, . . . traveling bags, insulated food or beverage bags, . . . knapsacks and back-packs, . . . sports bags . . . and similar containers . . . of textile materials: . . . With outer surface of sheeting of plastic or of textile materials: . . . travel, sports and simi-lar bags" at a rate of duty of 17.8% ad valorem, based on a prior Customs ruling.[3]  After liquidation, CamelBak filed

---

[3]     On June 26, 2000, CamelBak filed an Administra-tive Ruling Request with Customs, seeking a ruling on the classification of eleven of CamelBak's back-mounted packs.  On December 18, 2001, Customs issued ruling number HQ964444, classifying three of CamelBak's packs in subheading 4202.92.05 as "Trunks, . . . traveling bags, insulated food or beverage bags, . . . knapsacks and back-packs, . . . sports bags . . . and similar containers . . . of textile materials: . . . With outer surface of sheeting of plastic or of textile materials: . . . Insulated food and beverage bags . . . With outer surface of textile materials." Customs classified the remaining eight packs (including the Blow Fish, H.A.W.G. and M.U.L.E.) in subheading

a protest. Customs denied the protest and this action commenced, pursuant to 28 U.S.C. § 1581(a), in the Court of International Trade.

The parties filed cross-motions for summary judgment at the trial court addressing the proper classification of the subject articles. In its motion for summary judgment, CamelBak argued that the subject articles constituted "composite goods" made up of two components—the cargo component, which was prima facie classifiable as a "travel, sports, [or] similar bag[]" and the hydration component, which was prima facie classifiable as an "insulated beverage bag." CamelBak contended that the subject articles had to be classified pursuant to General Rule of Interpretation ("GRI") 3(b)'s essential character test because the two applicable subheadings refer to part only of the subject articles. Specifically, CamelBak argued that the following portions of HTSUS heading 4202 were relevant to the analysis:

> 4202 Trunks, suitcases, vanity cases, attache cases, briefcases, school satchels, spectacle cases, binocular cases, camera cases, musical instrument cases, gun cases, holsters and similar containers; traveling bags, insulated food and beverage bags, toiletry bags, knapsacks and backpacks, handbags, shopping bags, wallets, purses, map cases, cigarette cases, tobacco pouches, tool bags, sports bags, bottle cases, jewelry boxes, powder cases, cutlery cases and similar containers, of leather or of composition leather, of sheeting of plastics, of textile materials, of vulcanized fi-

4202.92.3020 as "travel, sports, and similar bags . . . backpacks."

> ber or of paperboard, or wholly or mainly covered with such materials or with paper:
>
> Other:
>
> 4202.92  With outer surface of sheeting of plastic or of textile materials:
>
> 4202.92  Insulated food or beverage bags: With outer surface of textile materials
>
>> 4202.92.04  Beverage bags whose interior incorporates only a flexible plastic container of a kind for storing and dispensing potable beverages through attached flexible tubing 7%
>
>> 4292.92.08  Other 7%
>
>> 4292.92.30  Travel, sports and similar bags: Other 17.8%

Applying the essential character test, CamelBak argued that the hydration component (i.e., the insulated beverage bag component) gave the subject articles their essential character and that the subject articles were properly classified as either "insulated food and beverage bags . . . whose interior incorporates only a flexible plastic container of a kind for storing and dispensing potable beverages through attached flexible tubing" under subheading 4202.92.04 or, alternatively, "insulated food and beverage bags . . . other" under subheading 4202.92.08, both dutiable at a rate of 7% ad valorem.

The government argued that the subject articles were not composite goods, but rather that a single tariff provision—the "travel, sports, and similar bags" provision—applied to the articles in their entirety. Thus, the gov-

ernment contended that Customs properly classified the subject articles as a whole as "travel, sports, and similar bags" under subheading 4202.92.30, HTSUS, through a straightforward application of GRI 1.

The Court of International Trade upheld Customs' classification decision concerning the subject articles and granted judgment for the government. CamelBak appeals, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II

We review the grant of summary judgment by the Court of International Trade without deference. *See, e.g.*, *Structural Indus., Inc. v. United States*, 356 F.3d 1366, 1368 (Fed. Cir. 2004). We review questions of law de novo, including the interpretation of the terms of the HTSUS, whereas factual findings of the Court of International Trade, including which heading the merchandise falls within, are reviewed for clear error. *Home Depot U.S.A., Inc. v. United States*, 491 F.3d 1334, 1335 (Fed. Cir. 2007). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a 'definite and firm conviction that a mistake has been committed.'" *Timber Prods. Co. v. United States*, 515 F.3d 1213, 1220 (Fed. Cir. 2008) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## III

A classification decision involves two underlying steps: (1) ascertaining the proper meaning of the tariff provisions, which is a question of law; and (2) determining which heading the particular merchandise falls within, which is a question of fact. *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006). The GRIs govern classifications of imported goods under HTSUS

and we apply them in numerical order. *BASF Corp. v. United States*, 482 F.3d 1324, 1325-26 (Fed. Cir. 2007).

"Under GRI 1, the court must determine the appropriate classification 'according to the terms of the headings and any relative section of chapter notes' with all terms construed to their common commercial meaning." *Millennium Lumber Distrib., Ltd. v. United States*, 558 F.3d 1326, 1328-29 (Fed. Cir. 2009). We apply GRI 1 as a substantive rule of interpretation, such that when an imported article is described in whole by a single classification heading or subheading, then that single classification applies, and the succeeding GRIs are inoperative. *See Mita Copystar Am. v. United States*, 160 F.3d 710, 712 (Fed. Cir. 1998). With regard to assessing an imported article pursuant to GRI 1, we consider a HTSUS heading or subheading an *eo nomine* provision when it describes an article by a specific name. *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999). Absent limitation or contrary legislative intent, an *eo nomine* provision "include[s] all forms of the named article[,]" even improved forms. *Id.*

However, as we held in *Casio, Inc. v. United States*, 73 F.3d 1095 (Fed. Cir. 1996), when an article "'is in character or function something other than as described by a specific statutory provision—either more limited or more diversified—and the difference is significant,'" it is not properly classified within an *eo nomine* provision. 73 F.3d at 1097 (quoting *Robert Bosch Corp. v. United States*, 63 Cust. Ct. 96, 103-04, 1969 WL 13787 (1969)). In order to determine whether the subject article is classifiable within an *eo nomine* provision, we look to whether the subject article is merely an improvement over or whether it is, instead, a change in identity of the article described by the statute. *See United Carr Fastener Corp. v. United States*, 54 C.C.P.A. 89, 91 (CCPA 1967). "The criterion is

whether the item possess[es] features *substantially in excess* of those within the common meaning of the term." *Casio*, 73 F.3d at 1098 (quotation marks and citation omitted) (emphasis in original).

When goods are prima facie classifiable under two or more headings or subheadings of HTSUS, we apply GRI 3 to resolve the classification. *Home Depot*, 491 F.3d at 1336. We apply GRI 3(a) when the goods, as a whole, are prima facie classifiable under two or more headings or subheadings to determine which heading provides the most specific description of the goods. *See* GRI 3(a); *Bauer Nike Hockey USA, Inc. v. United States*, 393 F.3d 1246, 1252 (Fed. Cir. 2004). When two subheadings "each refer to part only of the materials . . . contained in . . . composite goods," they are "regarded as equally specific" under GRI 3(a) and we apply GRI 3(b) to resolve the classification. GRI 3(a). GRI 3(b) instructs that we classify composite goods made up of different components "as if they consisted of the material or component which gives them their essential character."

IV

In reaching its conclusion that the subject articles are backpacks, the Court of International Trade began its analysis by applying GRI 1 to determine whether the subject articles were classifiable as a whole under a particular heading and subheadings. Turning to heading 4202, which the parties agreed applied to the subject articles, the Court of International Trade defined the terms "traveling bag," "sports bag," "insulated food or beverage bag," and "backpack"[4] and concluded that the

---

[4]    Specifically, the Court of International Trade defined the terms as follows: (1) a "traveling bag" includes "all forms of flexible containers used by travelers to carry or store items[,]" *CamelBak*, 704 F. Supp. 2d at 1340-41;

subject articles were properly classifiable under heading 4202, HTSUS. *CamelBak*, 704 F. Supp. 2d at 1340.

The Court of International Trade next determined that the subject articles were composed of an outer surface of textile materials and properly classifiable under 4202.92, HTSUS. *Id.* at 1342.

Turning to the final set of HTSUS subheadings applicable to the subject articles, the Court of International Trade noted that there were four competing subheadings: "'[i]nsulated food or beverage bags,' '[t]ravel, sports and similar bags,' '[m]usical instrument cases,' and '[o]ther.'" *Id.* The Court of International Trade then looked to Additional U.S. Note 1 to HTSUS Chapter 42 for guidance. Additional U.S. Note 1 explains that the subheading "travel, sports and similar bags" is broad and refers to "goods . . . of a kind designed for carrying clothing and other personal effects during travel, including backpacks and shopping bags of this heading . . . ." *Id.*

The Court of International Trade found as a fact that a portion of each of the subject articles was designed to carry water, while the remainder of the capacity was designed to carry cargo. *Id.* at 1344. Nevertheless, the Court of International Trade reasoned that the articles

---

(2) a "sports bag" includes "all forms of flexible containers used by individuals to carry or store items while they are engaged in activities involving physical exertion, or active pastime or recreation[,]" *id.* at 1341; (3) an "insulated beverage bag" includes "all forms of flexible reusable containers that are used to maintain the temperature of potable liquids during their transport or temporary storage[,]" *id.*; and (4) a "backpack" includes all forms of "bags made of sturdy material, which feature padded, adjustable shoulder straps, and which are designed to permit supplies and gear to be carried on the wearer's back[,]" *id.* at 1341-42.

"fall[] within the tariff provision covering 'travel, sports, and similar bags,' and [are] prima facie classifiable thereunder[,]" because they are properly described as "backpacks." *Id.* at 1342. The Court of International Trade further concluded that the subject articles could not be "fairly described as 'beverage bags'" as a whole because "there is simply too much that is designed to carry cargo (rather than beverages)." *Id.* at 1344. The Court of International Trade also determined that "the water-carrying and -dispensing functionalities" of the subject articles "do not remove them from the purview of 'travel, sports and similar bags'" because the tariff provision covering "travel, sports, and similar bags" is an *eo nomine* provision which includes all forms of the named article, even improved forms. *Id.* at 1343.

Having concluded that the "travel, sports and similar bags" subheading encompassed the subject articles as a whole, the Court of International Trade applied GRI 1 and classified the subject articles under subheading 4202.92.30. *Id.* at 1345. In so doing, the Court of International Trade rejected CamelBak's argument that the hydration component of the subject articles removed them from the scope of the *eo nomine* backpack provision, thereby making them new articles of commerce and composite goods. *See id.* Addressing CamelBak's argument, the Court of International Trade explained that "[t]he mere fact that a piece of merchandise may consist of more than one component does not necessarily make that merchandise a 'composite good' subject to classification under GRI 3(b)." *Id.* The Court of International Trade then determined that "[t]here is nothing about incorporating into a backpack a compartment designed to contain (and maintain the temperature of) beverages that makes the backpack *not* a backpack." *Id.* at 1346 (emphasis in original). That is, "a 'backpack' is a 'backpack,' no matter

how . . . elaborate it may be." *Id.* In essence, the Court of International Trade regarded the hydration component of the subject articles as an incidental feature and did not consider its primary design or use as contributing to the classification characteristics of the articles.

V

On appeal, CamelBak concedes that the cargo component of the subject articles is prima facie classifiable as "travel, sports and similar bags" of subheading 4202.92, because it permits a consumer to carry some personal effects, as defined in Additional U.S. Note 1. CamelBak contends, however, that the subject articles cannot be classified under 4202.92.30 by reference to GRI 1 alone, because the "travel, sports and similar bags" provision does not cover the articles as a whole (i.e., the subject articles are not *eo nomine* backpacks). Rather, CamelBak repeats its argument that the subject articles are made up of two major components each of which is prima facie classifiable under a different subheading, i.e., the cargo component, which is prima facie classifiable under 4202.92.30 HTSUS and the hydration component, which is prima facie classifiable under 4202.92.04 HTSUS. Thus CamelBak argues that the Court of International Trade erred when it failed to conduct a GRI 3(b) essential character analysis.

The government, relying on the common meaning of the term "backpack" and Additional U.S. Note 1 to Chapter 42, responds that the Court of International Trade correctly sustained Customs' classification of the subject articles under 4202.92.30 HTSUS as "travel, sports and similar bags" pursuant to GRI 1 because backpacks, as a whole, are designed to carry and organize a multitude of personal effects, including water. Thus, the backpack provision encompasses the subject articles in their en-

tirety. The government further contends that, as an *eo nomine* provision, subheading 4202.92.30 covers all forms of travel and sports bags including those that carry water in a water bladder. Accordingly, the government contends that a GRI 3(b) analysis is not triggered in this case because the Court of International Trade correctly classified the subject articles pursuant to GRI 1.

## VI

In this case, we are called upon to determine whether the Court of International Trade correctly classified the subject articles as "backpacks" falling within the "sports, travel, and similar bags" *eo nomine* provision of subheading 4202.92.30, HTSUS. If the subject articles fall within the scope of the *eo nomine* backpack provision then, under *Mita Copystar*, GRI 1 mandates that the subject articles be classified as "travel, sports and similar bags" and GRI 3 is not triggered.[5]

Turning to the classification of the subject articles, we note that although *Casio* sets forth the proposition that a change in identity removes an article from an *eo nomine* provision, it does not provide the analytical tools or factors for making that determination. The case law of this and our predecessor court, however, provides several analytical tools or factors we can use to assess whether the subject articles are beyond the reach of the *eo nomine*

---

[5] As a preliminary matter, we note that GRI 3(b), as opposed to GRI 3(a), resolves the proper classification of the subject articles if GRI 3 is triggered. Here, the cargo component of the subject articles is not insulated (i.e., able to maintain the temperature of potable liquids during their transport or temporary storage) and, therefore, does not fall within the "insulated beverage bag" provision of heading 4202, HTSUS. Thus the subject articles are not prima facie classifiable as a whole as insulated beverage bags and GRI 3(a)'s rule of specificity does not apply.

backpack provision. These factors include the design of the subject articles, *see Casio*, 73 F.3d at 1098 (affirming the trial court's finding that the subject articles—synthesizers—were not beyond the scope of the *eo nomine* "electronic musical instrument" tariff provision because the additional features of the articles were "designed primarily to make it easier for a musician to create music"), and the use or function of the subject articles, *see Trans-Atlantic Co. v. United States*, 471 F.2d 1397, 1399 (CCPA 1973) ("[W]e think that the primary function of the imported article should govern classification."); *United States v. Quon Quon Co.*, 46 C.C.P.A. 70, 72 (1959) ("use cannot be ignored in determining whether an article falls within an *eo nomine* tariff provision"); *see also BASF Wyandotte Corp. v. United States*, 855 F.2d 852, 853 (Fed. Cir. 1988) (citing *Quon Quon* for the proposition that "the use of a product may be considered in determining the classification of that article"). The design and use/function of the subject articles are important considerations, as our predecessor court observed in *Quon Quon*, when reviewing the classification of certain baskets:

> While unhesitatingly granting the truth of the contention that "baskets" in the tariff act provides for baskets "eo nomine," this does not help us in the least to decide whether the imported articles *are* baskets [and not furniture]. We are not so trusting of our own notions of what things are as to be willing to ignore the purpose for which they were designed and made and the use to which they were actually put. Of all things most likely to help in the determination of the identity of a manufactured article, beyond the appearance factors of size, shape, construction and the like, use is of paramount importance. To hold otherwise would logically require the trial court to rule out

evidence of what things actually are every time the [Customs] collector thinks an article, as he sees it, is specifically named in the tariff act.

46 C.C.P.A. at 73 (emphasis in original).

Several commercial factors also guide the court's assessment of whether articles fall within the scope of an *eo nomine* provision, including how the subject articles are regarded in commerce, *see Servo-Tek Prods. Co., Inc. v. United States*, 416 F.2d 1398, 1400 (CCPA 1969) (concluding that the subject articles were not regarded in commerce as merely "motors" and should not be classified as such), how the subject articles are described in sales and marketing literature, *see Fairchild Camera & Instrument Corp. v. United States*, 53 C.C.P.A. 122, 124 (1966) (classifying the subject articles as "cameras" based, in part, on the fact that they were consistently described as "cameras" in sales literature), and whether the additional component is a substantial or incidental part of the whole product, *cf. United States v. N.Y. Merch. Co.*, 435 F.2d 1315 (CCPA 1970).

Applying the above factors to the present case, we conclude that the Court of International Trade clearly erred in finding that the subject articles are nothing more than improved backpacks. It is correct that "travel, sports and similar bags" are *eo nomine* and include all forms of backpacks. The subject articles, however, "possess[ ] features *substantially in excess* of those within the common meaning" of the term backpack as defined by the Court of International Trade, which the court failed to regard. *Casio*, 73 F.3d at 1098 (emphasis in original). Thus, they cannot be classified *eo nomine* as conventional backpacks. At most, the cargo component is classifiable as a conventional backpack because it is designed and used to carry personal effects. It is undisputed, however,

that the hydration component has a different design and primary use: to provide a temperature-maintained, continuous source of hands-free hydration to a user while engaged in a sporting event or recreational activity. When using the subject articles, the user can drink the beverage at will, without removing the article, thereby minimizing any disruption in activity. As Wesley Watson, CamelBak's Vice President of Global Sourcing and Distribution testified, CamelBak's "core product is manufactured around hydration; allowing hydration to be provided to an active user in the best way and the easiest way. Hands-free hydration is a staple or a motto of our organization, and we design products specifically for markets that allow you to drink while you're using, while you're doing an activity." Indeed, the subject articles exist "to provide a hands-free . . . way to drink" and it was error for the Court of International Trade to discount the hydration component and characterize it as a mere feature without considering the subject articles' primary design and use.

That there is a substantial difference in identity of the subject articles from a conventional backpack is further demonstrated by the commercial factors, such as the higher prices CamelBak charges and consumers pay for the subject articles as compared to conventional backpacks, the placement of the subject articles in retail catalogues and stores in a "hydration pack" section rather than a "backpack" section, and CamelBak's reference to the subject articles as "hydration packs" in its literature and marketing materials. These factors demonstrate that subject articles are commercially known, advertised and sold as "hydration packs," as opposed to backpacks, and that consumers purchase them for different reasons than they purchase conventional backpacks.

Finally, the hydration component of the subject articles is not merely incidental to the cargo component but, instead, provides the articles with a unique identity and use that removes them from the scope of the *eo nomine* backpack provision. That is, the subject articles are not merely an improvement over the conventional backpack as the Court of International Trade concluded. Thus, the subject articles are not classifiable as a whole pursuant to GRI 1.

Rather, they are composite goods made up of two components, which lack a single specific classification under HTSUS (i.e., there is no HTSUS provision for combination backpacks and hydration packs). Each component of the subject articles is classifiable under a separate subheading of 4202.92 HTSUS—the cargo component is classifiable as a "travel, sports, or similar bag[ ]" under 4202.92.30 HTSUS, and the hydration component is classifiable as an "insulated food and beverage bag" under 4202.92.04 (or 4202.92.08) HTSUS. Accordingly, GRI 3(b) controls the classification of the subject articles.

## VII

Regarding the application of GRI 3(b), CamelBak contends that there are no factual disputes to resolve with respect to the essential character of the subject articles because the parties agree on the basic nature of the products and the government failed to refute the evidence CamelBak adduced in support of its summary judgment motion. Thus, argues CamelBak, a remand to the Court of International Trade is not necessary and this court can classify the subject articles pursuant to GRI 3(b). We are not persuaded by CamelBak's argument.

First, we note that the essential character of the subject articles is a question of fact. *See Home Depot*, 491 F.3d at 1337 ("the application of this [essential character]

test requires a fact-intensive analysis"); *Pillsbury Co. v. United States*, 431 F.3d 1377, 1380 (Fed. Cir. 2005) ("Predominance [in the context of GRI 3(b)] is a factual determination . . . ."). Second, contrary to CamelBak's argument, the parties dispute the essential character of the subject articles. Indeed, the government contends that CamelBak cannot prevail on a GRI 3(b) analysis because it failed to demonstrate by competent evidence that any component of the subject articles is classifiable as an insulated beverage bag.[6] Therefore, remand to the Court of International Trade to resolve the GRI 3(b) issue in the first instance is appropriate.

## VIII

For the foregoing reasons, we reverse the Court of International Trade's grant of summary judgment to the government and remand the case to the Court of International Trade for further proceedings.

**REVERSED AND REMANDED**

---

[6] Whether or not the hydration component of the subject articles is insulated (i.e., maintains the temperature of potable liquids during their transport or temporary storage) is the subject of a motion in limine pending in the Court of International Trade.

# United States Court of Appeals
# for the Federal Circuit

---

**CAMELBAK PRODUCTS, LLC,**
(SUCCESSOR-IN-INTEREST TO **CAMELBAK PRODUCTS, INC.**),
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2010-1420

---

Appeal from the United States Court of International Trade in Case No. 05-CV-0249, Judge Delissa A. Ridgway.

---

BRYSON, *Circuit Judge*, dissenting.

I respectfully dissent. The Court of International Trade upheld Customs' classification of the goods at issue in this case as "travel, sports and similar bags" within HTSUS 4202.92.30. That determination should be affirmed. Additional Note 1 to chapter 42 of the HTSUS tells us that this category includes goods "of a kind designed for carrying clothing and other personal effects during travel, including backpacks and shopping bags[.]" As an *eo nomine* provision, that subheading encompasses "all forms of the named article." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999). The fact

that an article features an improvement does not remove it from the statutory class. *See Casio, Inc. v. United States*, 73 F.3d 1095, 1098-99 (Fed. Cir. 1996). To be sure, there comes a point at which an "improvement" amounts to such a fundamental change in an item that the item cannot fairly be classified as a member of the *eo nomine* class. The majority concludes that the line has been crossed in this case. The Court of International Trade came to a contrary conclusion, and in my view that court's highly factual determination cannot be said to be clearly erroneous. *See id*. at 1098.

In holding that the products at issue are not backpacks, the majority relies heavily on its determination that the subject goods are sold for higher prices than traditional backpacks. To support its conclusion, the majority cites an article that appears in a magazine that is directed toward runners and as well as several retail catalogs that were admitted into evidence. The prices listed for backpacks that include a hydration component and for backpacks without that feature overlap considerably, and the record does not indicate that the price of backpacks having a hydration component is so out of line with the price of backpacks lacking that feature as to suggest clear error in the trial court's finding.

While it is true that the way particular products are marketed can affect whether they should be viewed as being members of an *eo nomine* class, the evidence in the record on that score is mixed. CamelBak's Vice President for Marketing and Product Management stated in his deposition testimony that product placement varies from retailer to retailer. He explained that many retailers place cycling-oriented articles with other cycling-oriented hydration products. But he also stated that some retail-

ers sell the subject articles alongside backpacks not having a hydration component:

> Q: [T]he hydration systems might be sold right alongside backpacks or packs that don't have hydration systems in them?
>
> A: They will be sold along side. Although in most of our retailers, there is a specific section in the department for, say, outdoor hydration systems. So there will be a day pack wall as the technical term, and there will be outdoor day pack hydration systems, and then there will be other packs that are not hydration systems.

That testimony lends support to the trial court's finding that the subject articles are properly classified in the *eo nomine* category for backpacks.

The majority points out that in its promotional and sales literature CamelBak refers to the subject articles as "hydration packs." That point, however, does not carry much probative force. It is not surprising that CamelBak has selected the adjective "hydration" to modify "pack," since the subject articles feature a useful and desirable hydration functionality not found in all backpacks. As is the case with any improved good, consumers who choose to purchase a backpack including a hydration component presumably desire just that: a backpack improved by the addition of a hands-free hydration system. A backpack equipped with a flashing light for use by pedestrians or cyclists using dark streets at night might be referred to as a "safety light backpack," and be sold to consumers looking for the safety light feature, but that improvement would not be a sufficient change to take such a backpack

out of the *eo nomine* category for backpacks. Moreover, the evidence does not show that there is a rigid distinction between the terms backpack, daypack, and hydration pack. For instance, the article from the running magazine compares the price and functionality of backpacks, daypacks, and hydration packs. And in its promotional material, CamelBak refers to one of its products as a daypack, suggesting that even the importer believes that a hydration pack can also be a daypack.

Importantly, CamelBak's promotional literature does not emphasize only the hydration component of its packs. It also touts the packs' storage and cargo-carrying functionality. CamelBak's 2003 catalog tells consumers that the "Mule" product "integrates increased cargo capacity" with CamelBak's most recent developments in hands-free hydration technology. CamelBak describes the "Hawg" product as a "Technical Cycling Pack." The "Hawg," according to CamelBak, is "[b]uilt for haulin' down a trail" and "holds 100 oz of water[] and enough gear, clothing, and food for extended rides." And the "SnowDAWG," which CamelBak describes as a "Versatile Winter Day Pack," is said to allow its purchasers to "Haul it all! Stuff in an extra layer, a pair of mittens, and a mid-morning snack, plus enough water for your snowshoeing, cross-country skiing, or sledding adventure."

In light of the record before it, the trial court did not clearly err in concluding that the subject imports are improved backpacks, classifiable in their entirety under subheading 4202.92.30 of the HTSUS. Because GRI 1 controls this case, there is no need to remand for a GRI 3(b) "essential character" analysis. I would affirm the judgment of the Court of International Trade.