# United States Court of Appeals for the Federal Circuit

---

**AROMONT USA, INC.,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2011-1017

---

Appeal from the United States Court of International Trade in case no. 03-CV-0354, Senior Judge Thomas J. Aquilino, Jr.

---

Decided: February 21, 2012

---

BRIAN A. SHER, Bryan Cave, LLP, of Chicago, Illinois, argued for plaintiff-appellee. Of counsel was JOSHUA J. HEIDELMAN.

MARCELLA POWELL, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellant. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, of Washington, DC, and BARBARA S. WILLIAMS, Attorney in charge, of New York, New York. Of counsel was SHERYL

A. FRENCH, Office of Assistant Chief Counsel, United States Customs and Border Protection, of New York, New York.

_____

Before DYK, PROST, and MOORE, *Circuit Judges*.

DYK, *Circuit Judge*.

The United States appeals the decision of the U.S. Court of International Trade ("Trade Court"). The Trade Court granted summary judgment in favor of Aromont USA, Inc. ("Aromont"), holding that the imported merchandise at issue was properly classifiable under subheading 2106.90.99 of the Harmonized Tariff Schedule of the United States ("HTSUS"). *Aromont USA, Inc. v. United States* ("*Summary Judgment Decision*"), No. 03-00354, 2010 WL 3199823, at *4 (Ct. Int'l Trade Aug. 12, 2010). We affirm.

## BACKGROUND

This case concerns the proper HTSUS classification of finished flavoring products that were imported by Aromont from France. In 2001, United States Customs and Border Protection ("Customs") classified Aromont's imported flavorings derived from veal, chicken, duck, lamb, beef, fish, lobster, mushroom, or vegetable stock under HTSUS subheading 2104.10.00 ("Heading 2104") covering "[s]oups and broths and preparations therefor . . . Other." J.A. 6. Aromont protested the classification, contending that the flavorings should have been classified under HTSUS subheading 2106.90.99 ("Heading 2106") covering "[f]ood preparations not elsewhere specified or included." J.A. 7. Heading 2106 carries a much lower ad valorem tax than Heading 2104. Customs denied the protest and liquidated the merchandise.

After denial of the protest, Aromont challenged Customs's decision before the Trade Court, again arguing that the proper classification was under Heading 2106. At the close of discovery, both the government and Aromont moved for summary judgment. On August 12, 2010, the Trade Court granted Aromont's motion and denied the government's motion, concluding that "as imported plaintiff's goods are properly classified under heading 2106 'Food preparations not otherwise specified or included.'" *Summary Judgment Decision*, 2010 WL 3199823, at \*4. Heading 2104, insofar as it covers "preparations" for soups and broths, is a principal use provision governed by HTSUS Additional U.S. Rules of Interpretation ("ARI") 1(a). The Trade Court found that the Aromont products are not covered by Heading 2104 because they are not principally used as soups or broths. *Id.* Instead, Aromont's "products are found in a variety of end uses." *Id.* While one of the many applications of the imports might be in soup, that was not the principal use. *Id.*

The government timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review the Trade Court's ruling on summary judgment de novo. *Intercont'l Marble Corp. v. United States*, 381 F.3d 1169, 1173 (Fed. Cir. 2004). "We may affirm a grant of summary judgment on a ground supported in the record but not adopted by the [trial] court if we conclude that there was no genuine issue as to any material fact and the movant was entitled to a judgment as a matter of law." *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1324 (Fed. Cir. 2009) (internal quotations omitted) (citing Fed. R. Civ. P. 56(c)).

Heading 2104 covers "[s]oups and broths and preparations therefor." J.A. 6. The soups and broths portion of this heading is an *eo nomine* provision, that is, a provision that describes an article by a specific name, not by use. *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011). The government does not contend that Aromont's flavorings are classifiable under the *eo nomine* provision covering soups and broths. Instead, the government contends that the flavorings are "preparations" for soups and broths covered by the principal use provision "preparations therefor."

Principal use provisions are governed by ARI 1(a), which provides that

> [i]n the absence of special language or context which otherwise requires— . . . a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use.

"Principal use" in this context has been defined as the use "which exceeds any other *single* use." *Lenox Collections v. United States*, 20 C.I.T. 194, 196 (1996) (citing Conversion of the Tariff Schedules of the United States Annotated into the Nomenclature Structure of the Harmonized System: Submitting Report 34–35 (USCIT Pub. No. 1400) (June 1983)).

In *Primal Lite, Inc. v. United States*, we construed ARI 1(a) to "call for a determination as to the group of goods that are commercially fungible with the imported

goods." 182 F.3d 1362, 1365 (Fed. Cir. 1999).[1] The so-called *Carborundum* factors provide guidance in determining what goods are commercially fungible with the imported goods. *See BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1377 (Fed. Cir. 2011). These factors include: use in the same manner as merchandise which defines the class; the general physical characteristics of the merchandise; the economic practicality of so using the import; the expectation of the ultimate purchasers; the channels of trade in which the merchandise moves; the environment of the sale, such as accompanying accessories and the manner in which the merchandise is advertised and displayed; and the recognition in the trade of this use. *United States v. Carborundum Co.*, 536 F.2d 373, 377 (CCPA 1976). Here, the parties dispute the application of the pertinent factors, as follows.

*Actual Use.* The government argues that "[t]he actual use of an imported article is irrelevant to classification in a principal use tariff provision." Appellant Br. 21. Thus, it contends that the trial court erred in predicating its decision primarily on the actual use of the merchandise. The government points out that under the HTSUS, there are two separate types "use" provisions—one for determining an article's "actual use" and the other for determining the "principal use" of articles of its kind. The government theorizes that the two provisions must be different from each other and that actual use must therefore be pertinent only to the "actual use" provision.

---

[1] *See also Pistorino & Co. v. United States*, 607 F.2d 989, 992 (CCPA 1979) (finding that beam cutting machines were properly classifiable under a particular heading because "the imported machines were competitive with the machines which appellant was attempting to distinguish, and . . . the imported machines and the other machines could be used side by side and could be used as replacements for one another in many applications").

We reject the government's argument. In *Carborundum*, the court recognized the relevance of "the use, if any, in the same manner as merchandise which defines the class." 536 F.2d at 377; *see also Maher-App & Co. v. United States*, 418 F.2d 922, 927 (CCPA 1969) (Baldwin, J., concurring) ("Nor will proof that the merchandise in question was *actually* used for the purpose . . . be sufficient, although it will be relevant."). In *Primal Lite*, we weighed heavily the actual use of the imports in question in determining the group of goods that were commercially fungible with the imported goods. 182 F.3d at 1365. Specifically, in interpreting a principal use provision, we held that the imported goods did not consist of "lighting sets of a kind used for Christmas trees" because an "affidavit established that the principal use of [the] imported goods was not for Christmas trees, and the government provided no evidence that those goods and those commercially fungible with them are principally used for Christmas trees." *Id.*

To be sure, under "actual use" provisions of the HTSUS, imports are classified according to the actual use to which they are put in the United States "'if such use is intended at the time of importation, the goods are so used and proof thereof is furnished within 3 years after the date the goods are entered.'" *Id.* at 1363 (quoting ARI 1(b)). But there is no inconsistency in looking at actual use under both provisions. Actual use of the imported goods is the *only* factor that is looked at under actual use provisions. In contrast, under principal use provisions, actual use of the particular imported goods is evidence of the principal use of the merchandise involved. Actual use of the goods involved is but one of a number of factors, and perhaps one of the more important of the *Carborundum* factors.

The other *Carborundum* factors take account of the fact that a single item might be put to a use different than its ordinary use. *Primal Lite*, 182 F.3d at 1364 ("The purpose of 'principal use' provisions . . . is to classify particular merchandise according to the ordinary use of such merchandise, even though particular imported goods may be put to some atypical use."); *see also Clarendon Mktg., Inc. v. United States*, 144 F.3d 1464, 1467 (Fed. Cir. 1998); *Pistorino*, 607 F.2d at 992. Thus, "a classification covering vehicles principally used for automobile racing would cover a race car, even if the particular imported car was actually used solely in an advertising display." *Primal Lite*, 182 F.3d at 1364.

The government also argues that even if actual use is relevant, as we have held, the evidence of actual use supplied by Aromont is not relevant because it concerns the use of goods for years other than the year of importation (2001). *See* ARI 1(a). The deposition testimony of Terry Wight ("Wight"), former vice president of sales and marketing of Aromont, indicates, however, that the during the relevant time period, the imported products were always used as a flavor note, especially by industrial customers. *See* J.A. 328 ("They purchased the Aromont product as an ingredient that went into their sauces or gravies. Almost to a tee, they bought it as a flavor profile for those products."). Wight also stated that the share of sales to industrial customers (which used the products as a flavoring note) was higher in 2001 than in subsequent years. J.A. 330. Wight was the sole employee of Aromont in the United States during the years that the goods at issue were imported, and he "was basically doing all of the ordering, the distributing, the selling, the marketing, [and] the accounting." J.A. 315. His deposition testimony is thus highly probative. In light of this testimony, the government's passing suggestion that the use of the goods

was not shown to be the same in 2001, 2002, and 2003 does not create a genuine dispute of material fact.

In sum, because the goods imported were used primarily for as flavor profiles for sauces and gravies, this factor weighs heavily against classifying the flavorings as preparations for soups and broths.

*Physical characteristics.* Another of the *Carborundum* factors is the physical characteristics of the imports. 536 F.2d at 377; *see also Maher-App & Co.*, 418 F.2d at 926 (Baldwin, J., concurring). Here, the physical characteristics of the imports distinguish them from other preparations for soups and broths. The Explanatory Notes to Heading 2104 state that the heading covers "[p]reparations for soups or broths requiring only the addition of water, milk, etc."[2] Aromont presented deposition testimony that the products at issue do not reconsti-

---

[2] The Explanatory Note to Heading 2104 reads:

This category includes:

(1) Preparations for soups or broths requiring only the addition of water, milk, etc.

(2) Soups and broths ready for consumption after heating.

These products are generally based on vegetable products (flour, starches, tapioca, macaroni, spaghetti and the like, rice, plant extracts, etc.), meat, meat extracts, fat, fish, crustaceans, molluscs or other aquatic invertebrates, peptones, amino-acids or yeast extract. They may also contain a considerable proportion of salt.

They are generally put up as tablets, cakes, cubes, or in powder or liquid form.

tute into soup or broth easily by adding a liquid because the result is a "cloudy liquid."  J.A. 293.

The government relies on the fact that the Explanatory Notes to Heading 2104 state that the products covered by the heading "are generally put up as tablets, cakes, cubes, or in powder or liquid form."  The government's import specialist stated in his declaration that "[a]rticles principally used as preparations for soups and broths are sold in many different forms, including solid cubes, cakes, pastes, liquids, concentrated or reduced liquids, or powders," and this would include a product such as Aromont's with a honey-like consistency.  J.A. 86. But this cannot support classification.  If preparations for soups and broths can in fact be found in almost any form, the fact that the imports at issue take one of those forms is not significant.

*Cost.*  The cost of the flavorings also weighs against classifying Aromont's imports under Heading 2104. Aromont presented evidence, unrebutted by the government, that its products were "very expensive" compared to other products on the market, J.A. 321, and that they were not "the right application" for a soup or broth, J.A. 293.  Due to their higher cost and concentrated flavor, Aromont's flavorings were intended to be used only as a "flavor profile" or a "flavor note" to other recipes, and thus would generally be added in small amount to enhance flavor. J.A. 327–28.

*Expectations of the ultimate purchasers.*  As to expectations, the government argues that Aromont specifically advertised that its products could easily be fashioned into soup or broth with the addition of wine, water, meat jus, or cream, and thus the ultimate purchasers of the product would expect it to do so.  It is true that Aromont's advertisements mention soup as one potential use of the

Aromont imports, but we are concerned with the primary use. Aromont's advertisements list soup as only one of many potential uses for its imports. For example, one advertisement states, "Use these classical stocks and Veal Demi-Glace to make delectable sauces, soups, glazes and many other dishes. Applications abound, with the addition of wine, water, cream or butter." J.A. 92. Another advertisement states that "delectable traditional sauces, glazes, stocks and soups are readily fashioned," and it goes on to suggest that the product is an "[e]xcellent mother recipe for all your stocks, sauces, soups and/or other recipes." J.A. 93. Thus, these advertisements support the argument that an ultimate purchaser would expect the product to be suitable for a number of uses, including for soup, but not that use in soup is its primary use.

*Channels of trade.* Courts also compare the channels, class, or kind of trade in which the merchandise moves. *See Carborundum*, 536 F.2d at 377 (citing *Maher-App & Co.*, 418 F.2d at 926 (Baldwin, J., concurring)). It was shown that Aromont's products moved through the same specific channels of trade as preparations for soups and broths, such as large ingredient customers, food service distributors, and retail stores. It was also shown that Aromont's products and other known preparations for soups and broths are both sold in retail establishments such as Whole Foods. These similarities prove little, given the fact that most food products are generally sold through such channels.

*Environment of the sale.* The environment of sale, such as accessories that accompany the merchandise and the manner in which the merchandise is displayed, can also be relevant. *See id.* (citing *United States v. Baltimore & Ohio R.R. Co.*, 47 CCPA 1 (1959)). For example, in *Baltimore & Ohio Railroad Co.*, our predecessor court

found that certain decorative coffee cups and saucers were not primarily used for serving coffee or other liquids, reasoning in part that the items did not match any dinnerware sets also sold at the store and were not sold in sets of six, eight, or twelve, both of which were customary of cups designed to serve coffee or other liquids. 47 CCPA at 3. Here, this factor does not benefit either party. There was no evidence presented that the flavorings were sold with certain accessories or displayed in a manner particular to soup and broth preparations.

*Recognition in the trade.* Last, courts consider whether the merchandise is recognized in the trade as having that particular use or whether it meets certain specifications recognized in the trade for that particular class of products. *See Carborundum*, 536 F.2d at 377 (citing *Bob Stone Cordage Co. v. United States*, 51 CCPA 60 (1964) (holding that the imported merchandise did not meet the specifications recognized in the trade to be considered agricultural binding twine)). Neither party provided evidence of industry-specific specifications for preparations for soups and broths. The government points out that Aromont, in some of its own documents, characterized some of the imported merchandise as "broth." *See, e.g.*, J.A. 44. One of Aromont's executives testified, however, that Aromont's use of the word "broth" was merely shorthand and did not mean that any of the products were broths per se as defined in the trade. J.A. 294. He indeed testified that they were not. The government did not present contrary evidence, except for a conclusory statement by its expert. *See* J.A. 87. This factor nonetheless slightly favors the government given the importer's own description of the product.

In sum, Aromont has made a strong showing with respect to the factors for actual use, physical characteristics, and cost. The government has not made a sufficient

showing that any of the other factors requires a contrary result, or that there is a genuine issue of material fact on any of the relevant factors. Thus, when viewed in its totality, the principal use of the class of goods at issue is not as preparations for soups and broths.

We note that the government challenged Aromont's supporting evidence on the ground that paragraphs 12 through 28 of the declaration of Khaled Zitoun ("Zitoun Declaration"), Vice President of Kerry Ingredients & Flavors, which purchased Aromont around 2001, were improper because he lacked personal knowledge of the assertions in the paragraphs and he did not properly authenticate the documents referred to therein. Like the Trade Court, we need not decide this issue because we do not rely on the Zitoun Declaration. Other admissible evidence supports our conclusion that summary judgment in favor of Aromont was proper.

Because the merchandise does not fall under Heading 2104, it falls under Heading 2106, a "catch all" provision covering "[f]ood preparations not elsewhere specified or included."[3] We therefore affirm the Trade Court's summary judgment in favor of Aromont that the merchandise falls under Heading 2106.

## AFFIRMED

### COSTS

No costs.

---

[3] Before the Trade Court, Aromont raised the alternative argument that two previous Customs rulings classifying its products under Heading 2106 bound Customs to that classification. Aromont again raises this argument on appeal. Because we find that summary judgment in favor of Aromont is appropriate, we need not address this alternative argument.