REYNA, Circuit Judge,
dissenting.
The majority holds that the Court of International Trade (“CIT”) erred in refusing to consider intended and principal use to determine the common meaning of two eo nomine tariff classifications under the Harmonized Tariff Schedule of the United States (“HTSUS”). I do not agree that principal use should be considered in an eo nomine analysis. For this and other reasons set forth below, I respectfully dissent
I
A foundational tenet of tariff classification law is that eo nomine provisions are distinct from use provisions and do not depend on the principal or actual use of the imported merchandise in the United States.[1] The majority recognizes that the two tariff subheadings at issue in this case — 7318.12.00, “other wood screws,” and 7318.14.10, “self-tapping screws” — are eo nomine provisions, not principal or actual use provisions. The majority nevertheless imports a principal use analysis into its construction of the eo nomine subheadings by requiring consideration of the intended use of the named articles. As a result, the majority conflates two very different categories of tariff classifications. In holding that the CIT erred in failing to consider the intended or principal use of “other wood screws” and “self-tapping screws,” the majority ignores a fundamental rule of interpretation of the harmonized tariff classification system.
The majority misunderstands the basic distinction between eo nomine provisions and use provisions. An eo nomine provision describes an article by a specific name, not by use, and includes all forms of *1362 the named article.[2] It is improper to import a use limitation into an eo nomine provision unless the name of the good inherently suggests a type of use. Carl Zeiss, 195 F.3d at 1379. A use provision, on the other hand, describes an article by its principal or actual use in the United States at the time of importation. Use provisions are governed by the U.S. Additional Rules of Interpretation (“ARI”), and principal use is defined as the use that “exceeds any other single use” in the United States. Aromont, 671 F.3d at 1312; ARI 1(a).
The majority faults the CIT for adhering to the distinction between eo nomine and use provisions and reads the CIT’s decision as inferring that any consideration of use in an eo nomine analysis is prohibited:
As an initial matter, our cases do not lead to the conclusion the Court of International Trade inferred that, under the HTSUS, once a provision is regarded as eo nomine because the heading describes goods by their names, use should in no respect be weighed in classifying subject articles.
Maj. Op. at 1358. Yet, this is not what the CIT determined. To the contrary, the CIT correctly noted that “a use provision implicates a different analytical framework than does an eo nomine provision” and that a use limitation should not be read into an eo nomine provision unless inherent in the provision’s common commercial meaning.[3] Far from holding that use can never be considered, the CIT concluded only that it “cannot support this instance of reading use into an eo nomine tariff provision under the HTSUS.” Id. (emphasis added).
The majority further condemns the CIT’s reliance on General Rule of Interpretation (“GRI”) 3(c), implying that the CIT should have resorted to intended use to break the tie between the two subheadings. Maj. Op. at 1360. The majority’s approach ignores that we are bound to apply the GRIs as we would any other statute.[4] As we have often stated in our case law, the GRIs are the interpretive framework that govern tariff classifications.[5] The rules must be applied in numerical order, and each rule entails a different analysis and consideration of different factors. Indeed, GRI 3(c) exists for the very fact pattern in this case, in which the imported goods are prima facie classifiable under more than one heading or subheading. Stated differently, intended use does not become relevant to the eo nomine analysis just because an imported article satisfies more than one eo nomine classification. Hence, it is incorrect to fault the CIT for sequentially proceeding through the GRIs without identifying which rule should have applied.
The majority relies on United States v. Quon Quon Company for its argument that use may be of “paramount importance” in construing an eo nomine provision.[6] This reliance is misplaced. Quon Quon is a 50-year-old case from the Court of Customs and Patent Appeals (“CCPA”) that was interpreting a provision of the old Tariff Schedule of the United States *1363 (“TSUS”). While the HTSUS is governed by the GRIs and ARIs, the TSUS operated under an entirely different set of interpretive rules, known as the General Head-notes and Rules of Interpretation.[7] We have held that prior TSUS cases are not binding on classifications made under the HTSUS.[8] Yet, even under the TSUS, consideration of use was generally precluded in construing eo nomine provisions.[9] The majority thus fails to base its analysis in the current interpretive framework — the GRIs; it also provides an inaccurate and incomplete analysis of the now-defunct TSUS framework.
The majority also relies on CamelBak Products, LLC v. United States for the proposition that the intended use of products may need to be considered even under the HTSUS.[10] To be sure, CamelBak articulated a test to determine whether an additional component or function of an article, otherwise named by an eo nomine provision, substantially transforms the essential characteristic of the article such that it is no longer classifiable under the eo nomine provision.[11] CamelBak allows use to be considered only within the context of the substantial transformation test, which addresses the identity of the imported article, and does not stand for the idea that use should be considered in defining the proper meaning of an eo nomine heading as a matter of law. CamelBak cannot fairly be read to obscure the stark distinction between use provisions and eo nomine provisions.
Indeed, the majority’s articulation of when use should be considered in an eo nomine analysis effectively converts eo no-mine provisions into use provisions. The majority states that eo nomine provisions may “require an analysis of the intended use of products,” but does not explain when such an analysis is required or even how “intended use” differs from principal use as defined by ARI 1(a). Maj. Op. at 1358-59. In fact, the majority asserts that consideration of use in defining an eo no-mine provision may require reaching the ARIs. Maj. Op. at 1359 n. 2. This conclusion is in direct conflict with our prece-dential classification cases, which are minimally addressed by the majority.[12] In R.T. Foods, Inc. v. United States, we rejected the importer’s argument that the CIT should have performed a principle use analysis to define the eo nomine provision at issue, noting that a “ ‘principle use’ analysis is only used for those headings ‘controlled by use,’ as opposed to eo nomine headings.”[13] Our prior law demonstrates that we have consistently cautioned against importing use limitations when defining the proper meaning of an eo nomine *1364 provision as a matter of law.[14] The majority fails to address this precedent in reaching its conclusion, which erases the clear distinction between eo nomine provisions and use provisions.
II
The majority further errs by concluding that the common meaning of “other wood screws” and “self-tapping screws” inherently suggests a type of use. The majority first weighs that its own understanding of the term “other wood screws” inherently suggests intended use, even “without resort to any extrinsic authority.” Maj. Op. at 1859-60. But tariff classification is not patent claim construction, and “extrinsic authority” is often necessary in tariff classification cases to divine a term’s common meaning.[15] While precedent allows us to rely to some extent on our own understanding of the term,[16] we cannot ignore objective evidence showing that the term’s common meaning does not comport with our own unaided understanding.
The majority also relies on decisions of the U.S. Customs Court to support its conclusion that the name “wood screws” inherently suggests use.[17] These cases interpret a subheading of the old TSUS, titled “wood screws (including lag screws or bolts) of base metal.” The U.S. Customs Court, however, preceded the CIT as the trial-level court for trade cases and is thus not binding precedent.[18] As noted above, the TSUS operated under a different set of interpretive rules,[19] and prior TSUS cases are not dispositive, although they may be helpful in interpreting identical language in the HTSUS.[20] Here, the relevant HTSUS language is far from identical to the old TSUS provisions. The TSUS subheading for “wood screws (including lag screws or bolts) of base metal” was changed to the six digit subheading “other wood screws,” and the HTSUS adopted a later six-digit subheading for “self-tapping screws.” The addition of the term “other” in the “other wood screws” subheading indicates that it is now a residual provision designed to capture wood screws not specifically classified elsewhere.[21] Hence, the majority’s reliance on 40-year-old precedent interpreting different classification terms is neither disposi-tive nor helpful.
The relevant industry and lexicographic sources define “other wood screws” and “self-tapping screws” in terms of their design characteristics and physical properties, not their principal or intended uses, as the majority suggests. Consider the standards promulgated by the American National Standards Institute (“ANSI”), which provide detailed, multi-page specifications on the dimensions, length, thread, *1365 point, head, material, and other characteristics of wood screws and tapping screws.[22] The CIT discussed in detail these standards, which state, among other things, that self-tapping screws are “case hardened to meet the performance requirements set forth in these specifications.” J.A. 643. Had the majority also examined these standards, it would have seen that these characteristics are far from “relatively trivial changes,” but instead speak to the very features that define each screw type. Maj. Op. at 1360-61.
The majority does consider the Glossary of Terms promulgated by the American Society of Mechanical Engineers (“ASME”), but it takes an isolated reading of these definitions to support its assertion that intended use must be considered. The ASME Glossary of Terms defines a “tapping screw” and a “wood screw” as follows:
3.1.2.22 tapping screw: has a slotted, recessed, or wrenching head and is designed to form or cut a mating thread in one or more of the parts to be assembled. Tapping screws are generally available in various combinations of the following head and screw styles: fillis-ter, flat, flat trim, hexagon, hexagon washer, oval, oval trim, pan, round, and truss head styles with thread-forming screws, Types A, B, BA, BP, and C, or thread cutting screws, Types D, F, G, T, BF, BG, and BT as illustrated and described below.
3.1.2.30 wood screw: a thread forming screw having a slotted or recessed head, gimlet point, and a sharp crested, coarse pitch thread, and generally available with flat, oval, and round head styles. It is designed to produce a mating thread when assembled into wood or other resilient materials.
J.A. 660, 662. The majority fails to address the detailed descriptions provided by these definitions, which outline the head, point, and threading of each screw type, and instead chooses to latch onto the definitions’ statements about the function and capabilities of the screws as evidence that intended use must be considered. Maj. Op. at 1359-60. These statements, however, do not by themselves implicate a principal or intended use analysis. Describing a named article by function or capability is not the same as limiting the eo nomine provision to that article’s principal or intended use in the United States marketplace.
The majority commits similar error in its analysis of the Explanatory Notes for heading 7318, which are published by the World Customs Organization and provide non-binding interpretive guidance. Kahrs Int'l, 713 F.3d at 644-45. While the majority asserts that the Explanatory Notes “expressly reference materials in which the screws are to be used,” the majority reads too much into the Notes by concluding that these references require consideration of intended use. Maj. Op. at 1359-60. The majority argues that the term “screws for wood” implies intended use but ignores that the Explanatory Notes actually describe wood screws in terms of their physical characteristics — i.e., they are “tapered and pointed, and they have a steeper cutting thread since they have to bite their own way into the material.” J.A. 710.
The majority also relies on the Explanatory Notes’ statement that self-tapping screws can “cut their own passage into thin sheets of metal, marble, slate, plasties, etc.” J.A. 710. As the CIT noted, however, this statement is not a clear limitation *1366 of the subheading s scope, but instead provides a non-exhaustive list of various materials into which self-tapping screws can cut their own passage. Examples in the Explanatory Notes are illustrative and do not provide a valid basis for limiting the scope of the subheadings themselves.[23]
Finally, Customs’ own publications and prior practice support construing the subheadings for “other wood screws” and “self-tapping screws” in terms of physical properties and design characteristics, not principal or intended use. Customs’ policy since 1995 has been that the most “objectively verifiable standard” for differentiating between threaded fasteners is to employ industry dimensional standards.[24] If a fastener did not fit squarely into a recognized standard, Customs applied the closest conforming standard, and if none existed, it would consider the majority of the fastener’s “design characteristics.”[25] Hence, Customs has traditionally classified fasteners under heading 7314 according to their physical properties and design characteristics, not intended use.
III
In sum, the majority unnecessarily confuses the tariff classification analysis by requiring the CIT to consider intended use when construing the eo nomine subheadings. The majority blurs the boundaries between eo nomine and principal use provisions in ways that will promote confusion and error in future classification cases. For these reasons, I dissent.

. Aromont USA, Inc. v. United States, 671 F.3d 1310, 1312 (Fed.Cir.2012); Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed.Cir.1999).

. Kahrs Int’l, Inc. v. United States, 713 F.3d 640, 645-46 (Fed.Cir.2013); CamelBak Prods., LLC v. United States, 649 F.3d 1361, 1364-65 (Fed.Cir.2011).

. GRK Can., Ltd. v. United States, 884 F.Supp.2d 1340, 1353 (Ct. Int’l Trade 2013).

. BASF Corp. v. United States, 482 F.3d 1324, 1325-26 (Fed.Cir.2007).

. See, e.g., BenQ Am. Corp. v. United States, 646 F.3d 1371, 1376 (Fed.Cir.2011).

. Maj. Op. at 1358 (citing United States v. Quon Quon Co., 46 C.C.P.A. 70, 73 (1959)).

. See, e.g., Robert Bosch Corp. v. United States, 63 Cust.Ct. 187, 188-89, 305 F.Supp. 921 (1969).

. JVC Co. of Am. v. United States, 234 F.3d 1348, 1355 (Fed.Cir.2000).

. Pistorino & Co., Inc. v. United States, 66 C.C.P.A. 95, 96, 599 F.2d 444 (1979) (noting that the "general rule precluding consideration of use in eo nomine designations applies here”).

. Maj. Op. at 1358-59 (citing CamelBak, 649 F.3d at 1368-69).

. CamelBak, 649 F.3d at 1367 (providing "several analytical tools or factors we can use to assess whether the subject articles are beyond the reach of the eo nomine backpack provision”).

. See, e.g., R.T. Foods, Inc. v. United States, 757 F.3d 1349, No. 2013-1188, 2014 WL 2981004 (Fed.Cir. July 3, 2014); Link Snacks, Inc. v. United States, 742 F.3d 962 (Fed.Cir.2014); Kahrs, 713 F.3d 640; Aromont, 671 F.3d 1310; BASF, 482 F.3d 1324.

. R.T. Foods, 757 F.3d at 1355-56, 2014 WL 2981004, at *4.

. Id. (quoting Kahrs, 713 F.3d at 646).

. See, e.g., Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1356-57 (Fed.Cir.2001) ("To ascertain the common meaning of a term, a court may consult dictionaries, scientific authorities, and other reliable information sources and lexicographic and other materials.” (internal quotations omitted)).

. See Len-Ron Mfg. Co. v. United States, 334 F.3d 1304, 1309 (Fed.Cir.2003).

. See Maj. Op. at 1360 (citing Trans-Atl. Co. v. United States, 68 Cust.Ct. 105, 108 (1972); David Komisar & Son, Inc. v. United States, 77 Cust.Ct. 88, 89 (1976)).

. See Deckers Corp. v. United States, 752 F.3d 949, 959 (Fed.Cir.2014).

. See, e.g., Robert Bosch, 63 Cust. Ct. at 188-89, 305 F.Supp. 921.

. JVC Co., 234 F.3d at 1355.

. See, e.g., Deckers, 752 F.3d at 951 (describing an "other” provision as applying to merchandise that cannot be "classified under a more specific subheading”).

. See J.A. 612-20 (ANSI B.18.6.1 describing "wood screws”); J.A. 621-48 (ANSI B.18.6.4 describing "threadcutting and thread-forming tapping screws”).

. Ruble’s Costume Co. v. United States, 337 F.3d 1350, 1359 (Fed.Cir.2003).

. Headquarters Ruling Letter 956811 (Apr. 14, 1995).

. Headquarters Ruling Letter 967919 (Jan. 24, 2006).