88

(C.D. 4674)

DAVID KOMISAR & SON, INC.
DAIDO CORP.                                    }  v. UNITED STATES
KARL SCHROFF & ASSOCIATES, INC.

Court Nos. 66/25014, etc.
Court Nos. 66/59707, etc.
Court No. 67/50316

Port of New York

(Decided November 26, 1976)

*Allerton deC. Tompkins* for the plaintiffs.
*Rex E. Lee*, Assistant Attorney General (*David R. Ostheimer*, trial attorney), for the defendant.

FORD, Judge: This matter is in effect a retrial of *Trans-Atlantic Company* v. *United States*, 68 Cust. Ct. 105, C.D. 4344 (1972), the record of which was incorporated. The actual importer or ultimate consignee is David Komisar & Son, Inc. notwithstanding the fact that entries were made in the name of Daido Corp., Karl Schroff & Associates, Inc. or David Komisar & Son, Inc.

Two factors distinguish the present cases and *Trans-Atlantic*. In the decided case the merchandise was invoiced as "Flat Head Fully Thread Slotted Wood Screws" while the invoices in the cases at bar describe the merchandise as sheet metal screws with or without further terms of description. Additionally, the Customs Laboratory made an analysis of the metal in the decided case and found a carbon content of 0.08 percent which was admittedly low carbon whereas in the cases at bar no finding of carbon content had been made by either party.

The merchandise imported was classified under items 646.60 and 646.63, Tariff Schedules of the United States, or as modified by T.D. 68–9, depending upon the diameter of the shanks of the screws. Duty was assessed at various rates under each provision depending upon the dates of entry.

Plaintiffs contend the proper classification is item 646.49 TSUS as wood screws and as such subject to duty at 12.5 per centum ad valorem.

The pertinent provisions involved herein provide as follows:

Bolts, nuts, studs and studding, screws, and washers (including bolts and their nuts imported in the same shipment, and assembled bolts or screws and washers, with or without nuts); screw eyes, screw hooks and screw rings; turnbuckles; all the foregoing not described in the foregoing provisions of this subpart, of base metal:

Of iron or steel:

\*   \*   \*   \*   \*   \*   \*

    Screws:

\*   \*   \*   \*   \*   \*   \*

      Other:

646. 60         Having shanks or threads not over 0.24 inch in diameter_____    22.5% [1963–67], 20% [1968], 18% [1969], 15.5% ad val. [1970]

646. 63         Having shanks or threads over 0.24 inch in diameter_____    19% [1963–67], 17% [1968], 15% [1969], 13% ad val. [1970]

    Wood screws (including lag screws or bolts) of base metal:

646. 49       Of iron or steel_____    12.5% ad val.

The record in the incorporated case and the case at bar establishes that wood screws are ordinarily threaded for two-thirds of the shank whereas metal screws, machine screws, or tapping screws, the terms being synonymous, are fully threaded. A machine screw will make its own threads in metal and a wood screw will do the same in wood. All witnesses agree the unhardened screws involved cannot be used in

metal because they are too soft since they are of low carbon content and are unhardened. The involved screws are used in hollow doors and thin plywood for which they are particularly satisfactory since the threads extend to the head. The use of the ordinary wood screw on such material would prove unsatisfactory.

In *Trans-Atlantic* the court concluded as follows:

As there is no dispute between the parties that the imported articles are screws and that commercial designation is not involved, the issue therefore revolves about the extent of the common meaning, i.e., does it refer to a physically distinct type of screw, having only two-thirds of its shank threaded or does it embrace any kind of screw which is primarily used in wood?

We are of the opinion that the latter controls notwithstanding the fact that the statute provides *eo nomine* for wood screws. The use of an article provided for *eo nomine* has ofttimes been considered an important factor in determining the proper tariff classification. *United States* v. *Quon Quon Company*, 46 CCPA 70, C.A.D. 699 (1959). The intent of Congress in enacting the language "Screws, commonly called wood screws" from the Tariff Act of 1897 to the Tariff Act of 1930 clearly indicates the term to mean screws intended for use in wood. *The Summaries of Tariff Information*, 1920, 1921, 1929; *Dictionary of Tariff Information*, 1924. The dictionary definitions set forth in the case of *United States* v. *Astra Bentwood Furniture Co.*, 25 CCPA 340, T.D. 49434 (1938), and the present day dictionaries such as *Funk and Wagnalls Standard Dictionary*, international edition (1963), p. 1449, and *Webster's Third New International Dictionary*, unabridged (1961), p. 2631, confirm the fact that wood screws are intended for use in wood.

On the other hand, the *"American Standard"* published by the American Society of Mechanical Engineers, defendant's exhibit A, and *The New American Machinists Handbook* (1955), indicate a thread length of approximately two-thirds of the screw length.

An examination of the record and plaintiff's collective exhibit 1, the imported screws, indicates to us that the imported article appears to be a hybrid developed for use in hollow doors, plywood, etc., wherein the thread to the head functions better than one partially threaded, yet is made of unhardened metal. Thus it is in the form of a screw ordinarily used in metal but is composed of unhardened metal and consequently unusable, as all witnesses agree, for that purpose. The imported screws appear to be primarily used in wood although admittedly they can be used in other soft material such as linoleum, asbestos and soft plastic.

Since our conclusion is that the imported screws are wood screws, classification under item 646.60, *supra*, must fall as the provision for wood screws under item 646.49, *supra*, is more specific. In addition, the language of the superior heading to item 646.60, *supra*, limits the screws provided therefor to such screws as are not described in the foregoing provisions of the subpart involved.

Defendant called Mr. L. J. Lovisek, an engineer with Industrial Fasteners Corp. with approximately 45 years experience in the field of screws and other fasteners. In effect the witness agreed the imported screws are too soft for use in metal and would serve the function for use in wood. This, however, in his opinion, does not make such screws wood screws. They would be unhardened machine screws. He further testified there are two methods of hardening screws, cyanide and gas carburizing, which he described as follows:

Q. Could you explain to the Court the two different types of hardening processes that you just mentioned?

A. Cyanide process is involved with two different ways of heat treating. In one, sodium cyanide is heated until it is melted. The parts are put into it until they get up to heat and then the parts are taken out and quenched in water. Now, that heating process causes some of the carbon from the cyanide to go into the steel and puts what we call a casing on the product. That also can be done with cyanide dust. Same process. Another process is the gas carburizing in which you take propane and break it down into elements and that atmosphere is fed into a furnace, the parts are put through the furnace and it picks up the carbon from the atmosphere and it deposits it into the steel. Again, causing a case to form. You quench after each one of these operations.

This process would harden the screws and make them suitable for use in metal notwithstanding the low carbon content. The witness in fact did harden a few of the samples which were received as defendant's exhibit D.

There is nothing in the record to indicate the screws were hardened after importation or that they were sold in any condition other than as imported. Based upon the fact that the screws may be hardened after importation, defendant contends the imported merchandise is unfinished screws by virtue of General Interpretative Rule 10(h).

Such a position is totally unrealistic. The merchandise in its condition as imported constitutes a finished screw intended for use in wood and is so used.

The reasoning for General Interpretative Rule 10(h) and the prior judicial decisions to include finished or unfinished articles was solely for the purpose to encompass such merchandise as has been advanced to a point where its use as the article provided for is clear or its utility for any other use is destroyed. *Waltham Watch Co.* v. *United States,* 25 CCPA 330, T.D. 49425 (1938); *Oxford University Press, New York, Inc.* v. *United States,* 20 Cust. Ct. 78, C.D. 1088 (1948); *Norge Division, Borg-Warner Corp.* v. *United States,* 44 Cust. Ct. 121, C.D. 2164 (1960); *F. W. Myers & Co., Inc.* v. *United States,* 57 CCPA 87, C.A.D. 982, 425 F.2d 781 (1970). The merchandise at bar while in the form of a machine screw has its utility for use in metal destroyed due to a lack of hardness. It is therefore no longer a machine screw for tariff purposes.

The record does not substantiate the fact that the imported screws were hardened after importation and sold as machine screws. Moreover, an importer has the right to fashion his merchandise to permit it to be assessed with duty at the lowest rate, provided the merchandise is in fact the article described as dutiable at that rate. *United States* v. *Citroen*, 223 U.S. 407 (1912).

It is well settled that, in the absence of deception, disguise, or artifice exerted to for the purpose of perpetuating a fraud upon the revenue of the United States, imported merchandise must be classified in its condition as imported. *United States* v. *Citroen, supra; United States* v. *Baker Perkins, Inc., et al.*, 46 CCPA 128, C.A.D. 714 (1959). In addition it is the condition of the merchandise as imported which controls the classification, not what it is made into after importation, except when classification is dependent upon use. *Leonard Levin Co.* v. *United States*, 27 CCPA 101, C.A.D. 69 (1939). The claimed classification herein is an *eo nomine* provision, and the imported screws fall within such provision notwithstanding the fact that they are hybrid in form.

Judgment will be entered accordingly.