# United States Court of Appeals for the Federal Circuit

---

**GRK CANADA, LTD.,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2013-1255

---

Appeal from the United States Court of International Trade in No. 09-CV-0390, Senior Judge Judith M. Barzilay.

---

Decided: August 4, 2014

---

CRAIG E. ZIEGLER, Montgomery, McCracken, Walker & Rhoads, LLP, of Philadelphia, Pennsylvania, argued for plaintiff-appellee.

JASON M. KENNER, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellant. With him on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, of Washington, DC, AMY M. RUBIN, Acting Assistant Director, International Trade Field Office, of New York, New York; and BETH C. BROTMAN, Office of Assistant

Chief Counsel, United States Customs and Border Protection, of New York, New York.

_____

Before PROST, *Chief Judge*,[*] CLEVENGER and REYNA, *Circuit Judges.*

Opinion for the court filed by *Chief Judge* PROST.  Dissenting opinion filed by *Circuit Judge* REYNA.

PROST, *Chief Judge*.

The United States appeals from the decision of the United States Court of International Trade granting GRK Canada Ltd.'s ("GRK") cross-motion for summary judgment that various screws imported by GRK were properly classified as "self-tapping screws" under subheading 7318.14.10 of the Harmonized Tariff Schedule of the United States (2008) ("HTSUS").  *GRK Canada, Ltd. v. United States*, 884 F. Supp. 2d 1340, 1342 (Ct. Int'l Trade 2013).  Because the Court of International Trade refused to consider the use of the screws at any step of determining the classification of the subject articles at issue, we vacate and remand for further proceedings consistent with this opinion.

I

The imported articles at issue are GRK's Model R4 Screws ("R4"), RT Composite Trim Head Screws ("RT"), and Fin/Trim Head Screws ("Fin/Trim").  All these screws are made with corrosion-resistant case-hardened steel, and they are marketed for use in carpentry as building material fasteners.  R4 screws, *inter alia*, have a flat self-

_____

[*]    Sharon Prost assumed the position of Chief Judge on May 31, 2014.

countersinking[1] head designed to cut away at the top layer of the material as the screw is driven into place. By contrast, RT and Fin/Trim screws are recommended for fine carpentry and trim applications, and these models have much smaller heads that are designed to prevent the screws from cracking and splitting the target material. RT screws, unlike Fin/Trim screws, include reverse threading, a second set of threads near the head that allows the head to be less noticeable along the surface of the target material. Each GRK model is available in a variety of lengths, diameters, and thread designs.

GRK imported the subject screws between January 2008 and August 2008. U.S. Customs and Border Protection ("CBP") classified the screws at liquidation under the HTSUS subheading 7318.12.00, "other wood screws." This classification carries a 12.5% *ad valorem* duty. GRK protested, claiming that the screws should instead have been classified under subheading 7318.14.10, "self-tapping screws," which would make them subject to a 6.2% *ad valorem* duty. The CBP denied GRK's protests, and GRK brought its challenge to the Court of International Trade, where the parties filed cross-motions for summary judgment.

## II

The Court of International Trade described this as "a challenging case," because the HTSUS does not specifically define either subheading. *GRK*, 884 F. Supp. 2d at 1345. It noted that the subheadings were *eo nomine* provisions and that, as such, they described "an article by a specific name, *not by use*." *Id*. It further characterized the government's position as relying not only on the

---

[1] "Countersinking" is the operation of enlarging and beveling the rim of a drilled hole such that the screw is inserted flush with the surface.

physical characteristics of screws but also the materials in which they are used.  The government argued that the scope of the "other wood screws" subheading was screws that were intended for use in wood or resilient materials (e.g., wood composite), while "self-tapping screws" were primarily intended to be used in materials such as steel, concrete, and marble.  The government further argued that GRK's screws were intended for use in wood or other resilient materials, and were therefore correctly classified as "other wood screws."  The Court of International Trade concluded that, as such, the government's argument "depends heavily on use," and "[t]his is a weakness that ultimately undermines the Government's proposed classification." *Id.*

The court extensively analyzed what it called "use" arguments advanced by the government.  In particular, it described the government's argument as an attempt to "convert an *eo nomine* provision into a use provision." *Id.* at 1353.  The court's analysis distinguished the case law on which the government relied as relating to the predecessor to the HTSUS, the Tariff Schedules of the United States (TSUS).  In TSUS cases, courts had considered the use of articles in interpreting *eo nomine* provisions.  However, in the Court of International Trade's view, such case law was not binding under the HTSUS due to its "far greater specificity, continuity, and completeness than the TSUS." *Id.*  Therefore, it determined that it would focus instead on physical characteristics in determining the scope of the subheadings at issue and in subsequently classifying the subject screws.

The Court of International Trade consequently established "workable definitions" for the subheadings.  It construed "other wood screws" as "having (1) a flat, recessed, oval, round, or slotted head, (2) partially unthreaded shank, (3) coarse pitch spaced threads, and (4) a sharp gimlet point, and may also have (5) potential modifications to these criteria (such as sharper point angles or

case hardening) so long as the modified screw retains an essential resemblance to a standard wood screw." *Id*. at 1348. A "self-tapping screw" was construed as "being a specially hardened screw that can cut or form its own threads in the substrate without a separate tapping operation. More specifically, self-tapping screws (1) are made of case hardened steel, (2) have passed certain performance requirements, and (3) do not require a separate tapping operation." *Id*. at 1352.

The Court of International Trade proceeded to then apply the General Rules of Interpretation of the Harmonized Tariff Schedule of the United States ("GRI") to classify the screws. Following the definitions that it had established, the court described GRK's screws as having features of both self-tapping and wood screws. In particular, GRK screws are made of heat-treated, case hardened steel, were manufactured to meet minimum torsional strength requirements, and could cut mating threads without separate tapping. GRK screws also resemble standard wood screws while possessing modifications of the various parameters that the court determined were characteristic of the "other wood screws" classification.

The court began its analysis by determining that because it would be reasonable to conclude that the GRK screws were both self-tapping and wood screws, the analysis had to proceed beyond GRI 1. It then skipped GRI 2, as it applies only to goods that are either unfinished or incomplete. Based on its working definitions of the subheadings, the court found that GRI 3(a) was inapplicable, as the subheadings described articles at similar levels of specificity. It also determined that GRI 3(b) did not to apply, as the screws were not composite goods. The Court of International Trade finally settled on the "rarely used" GRI 3(c), in which goods are classified under the subheading that occurs last in numerical order—in this case, self-tapping screws, which are classified under subheading 7318.14.10 (by contrast to other wood

screws under 7318.12.00). *Id*. at 1356. Accordingly, it ruled in favor of GRK, holding that the subject screws should be classified as self-tapping screws.

The United States appeals, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## III

The first step of a classification decision is to determine the proper meaning of a tariff provision, which is a question of law reviewed *de novo*. *Universal Elecs. Inc. v. United States*, 112 F.3d 488, 491 (Fed. Cir. 1997). The second step is to determine whether the subject imports are within a possible heading, which is a question of fact reviewed for clear error. *Id*. We review the Court of International Trade's grant of summary judgment as a matter of law, deciding *de novo* the interpretation of tariff provisions as well as whether there are genuine disputes of material fact. *Millennium Lumber Distribution Ltd. v. United States*, 558 F.3d 1326, 1328 (Fed. Cir. 2009).

In determining the proper meaning of a tariff provision, we have held that where the HTSUS does not expressly define a term, "the correct meaning of the term is its common commercial meaning." *Arko Foods Int'l, Inc. v. United States*, 654 F.3d 1361, 1364 (Fed. Cir. 2011). To determine the common commercial meaning, a court "may rely upon its own understanding of terms used, and may consult standard lexicographic and scientific authorities." *Airflow Tech., Inc. v. United States*, 524 F.3d 1287, 1291 (Fed. Cir. 2008). In particular, a court also refers to the Explanatory Notes accompanying the HTSUS, which, though not controlling, provide interpretive guidance. *E.T. Horn Co. v. United States*, 367 F.3d 1326, 1329 (Fed. Cir. 2004).

Neither party disputes that the tariff terms at issue in this case—"other wood screws" and "self-tapping screws"—are *eo nomine* provisions. "An *eo nomine* desig-

nation with no terms of limitation, will ordinarily include all forms of the named article." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (quoting *Hayes-Sammons Chem. Co. v. United States*, 55 CCPA 69, 75 (1968)). Although an *eo nomine* provision generally "describes the merchandise by name, not by use," such a provision may be limited by use when "the name itself inherently suggests a type of use." *Id.* As discussed above, the Court of International Trade distinguished prior analysis under the TSUS that incorporated use in determining the meaning of related *eo nomine* provisions and held that it "must instead operate from the premise that the HTSUS provisions here are *eo nomine* and do not implicate a use analysis." *Id.* at 1354. On that basis, it rejected the government's argument that the names of the tariff classifications inherently suggest that the kinds of materials in which the screws are used should be considered as part of their common commercial meaning.

As an initial matter, our cases do not lead to the conclusion the Court of International Trade inferred that, under the HTSUS, once a provision is regarded as *eo nomine* because the heading describes goods by their names, use should in no respect be weighed in classifying subject articles.

First, we have recognized that under certain circumstances use may be of "paramount importance" in guiding the court towards the proper commercial meaning of a term. *United States v. Quon Quon Co.*, 46 CCPA 70, 73 (1959). *Quon Quon*, for example, concerned a dispute over the classification of wicker table tops intended for use as patio furniture that were made of woven rattan as "baskets." *Id.* at 71. Our predecessor court determined that just because the tariff term "baskets" designated articles by name did not mean that use could not be considered in properly classifying the articles as furniture. *Id.* at 73-74. Of course, *Quon Quon* is a case determined under the old TSUS that has now been replaced by the HTSUS, which,

as the Court of International Trade points out, includes "far greater specificity, continuity, and completeness." *GRK*, 884 F. Supp. 2d at 1353 (quoting Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13343 (2d ed. 2012)). Nevertheless, even under the HTSUS, classification decisions may still require an analysis of the intended use of products. For example, in *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1368-69 (Fed. Cir. 2011), we cited *Quon Quon* in reversing the Court of International Trade's determination that articles were "improved backpacks" on the grounds that their principal intended use was for hydration. We held that the "hydration component of the subject articles is not merely incidental to the cargo component but, instead, provides the articles with a *unique identity and use* that removes them from the scope of the *eo nomine* backpack provision." *Id.* at 1369 (emphasis added). Therefore, even though *Camelbak* concerned *eo nomine* HTSUS provisions, we recognized that the use of the subject articles was an important aspect of their identity and, consequently, the articles' classification. In such a case, the court's inquiry includes the subject article's physical characteristics, as well as what features the article has for typical users, how it was designed and for what objectives, and how it is marketed. *Id.* at 1367-69; *see also Casio, Inc. v. United States*, 73 F.3d 1095, 1098 (Fed. Cir. 1996).

Second, we have taken into account use as an element of determining the proper meaning of classification terms—even under the HTSUS. This is how we interpret tariff designations whose common commercial meaning includes the intended use of articles. For example, when we previously considered the meaning of the *eo nomine* provision "vanity cases," we held that any article so classified must have the "containing, carrying, or organizing" of cosmetics as its "predominant use." *Len-Ron Mfg. Co., Inc. v. United States*, 334 F.3d 1304, 1311 (Fed. Cir.

2003). By contrast, in a case like *Carl Zeiss*, neither the common meaning of the term itself—"compound optical microscopes"—nor the term's use in trade or commerce excluded microscopes that might be used in surgery. 195 F.3d at 1379. Therefore, the use may be considered as part of the definition of *eo nomine* provisions, where, even if the *eo nomine* provision describes goods with respect to their names, the name itself may "inherently suggest[] a type of use." *Id.* at 1379.[2]

In sum, even under the HTSUS, use of subject articles may, under certain circumstances, be considered in tariff classification according to *eo nomine* provisions. This may occur at the stage of establishing the proper meaning of a designation when a provision's name "inherently suggests a type of use." *Id.* Or, once tariff terms have been defined, it may be the case that the use of subject articles defines an articles' identity when determining whether it fits within the classification's scope. *See, e.g., CamelBak*, 649 F.3d at 1379.

IV

The case at hand concerns two tariff provisions that must be interpreted, namely "other wood screws" and "self-tapping screws." As an initial matter, our common understanding of "other wood screws" seems naturally aligned with the intended use of screws. "Wood screws," as designated by the tariff provision, are not screws made

---

[2] Classification of subject articles may then need to reach the Additional Rules of Interpretation ("ARI"), which distinguish the treatment of articles based on whether tariff classifications are controlled by principal or actual use. *Primal Lite, Inc. v. United States*, 182 F.3d 1362, 1363 (Fed. Cir. 1999); *see also StoreWALL, LLC v. United States*, 644 F.3d 1358, 1365-67 (Fed. Cir. 2011) (Dyk, J., concurring).

of wood—but rather metal screws *used* to fasten wood. Even without resort to any extrinsic authority, it is evident that the material with which the screw is intended to be used is inherent within the name of the *eo nomine* tariff classification "other wood screw."

The HTSUS Explanatory Notes, Fourth Edition (2007) for Heading 73.18 also expressly reference materials in which the screws are to be used. "Screws for wood," according to the Explanatory Notes:

> **Screws for wood** differ from bolts and screws for metal in that they are tapered and pointed, and they have a steeper cutting thread since they have to bite their own way into the material. Further, wood screws almost always have slotted or recessed heads and they are never used with nuts.
>
> . . .
>
> The heading includes **self-tapping (Parker) screws**; these resemble wood screws in that they have a slotted head and a cutting thread and are pointed or tapered at the end. They can therefore cut their own passage into thin sheets of metal, marble, slate, plastics, etc.

J.A. 710.

As the Explanatory Notes indicate, the physical characteristics of "wood screws" and "self-tapping screws" will generally be similar. Indeed, self-tapping screws "resemble" wood screws in that they include slotted heads and cutting threads, and the screws "bite their way into the material." However, self-tapping screws are intended to cut into metal and slate.

Definitions of the terms in engineering standards further support meanings that include the screws' intended use. For example, the ANSI/ASME Standard B18:12-2001 (Glossary of Terms for Mechanical Fasteners) indi-

cates that "a wood screw . . . is designed to produce a mating thread when assembled into wood and other resilient materials." J.A. 660. Conversely, "a tapping screw . . . is designed to form or cut a mating thread in one or more parts to be assembled." J.A. 662.

Prior decisions of the United States Customs Court involving predecessors to the relevant provisions in the TSUS also support an understanding of wood screw that implicates use. In these cases, the Customs Court specifically confronted the problem of distinguishing between TSUS designations of "wood screws" and screws made "of iron or steel." The Customs Court determined that when considering the *eo nomine* provision for "wood screws" it should include the primary use of the screws at issue as a factor in determination of its proper classification. *Trans-Atl. Co. v. United States*, 68 Cust. Ct. 105, 108 (1972); *see also David Komisar & Son, Inc. v. United States*, 77 Cust. Ct. 88 (1976) ("A machine screw will make its own threads in metal and a wood screw will do the same in wood."). To be sure, the tariff designations changed in the HTSUS; in particular, "self-tapping screws" is a new subheading. However, the principle behind the designation of different screw types remains the same: the material that screws are principally intended to pass through and fasten is an important aspect of how screw types are defined.

Indeed, the end result of the Court of International Trade's analysis itself suggests the error in refusing to consider use of subject articles. The HTSUS has been modernized to reflect current commercial practice, and its hierarchical classification is more specific and carefully designed than the TSUS. The court nevertheless still ended up at the rarely used "tie-breaker" step of GRI 3(c). This was the inevitable result of its approach to distinguish between the relevant subheadings.

According to its working definitions, effectively the difference between an "other wood screw" and a "self-tapping screw" is that the latter is "specially hardened," meaning that it is made of case hardened steel and has "passed certain performance requirements." *GRK*, 884 F. Supp. 2d at 1352. Therefore, following that definition, a conventional wood screw transforms to a "self-tapping screw" once the screw is made of a hardened material, a relatively trivial change that could be motivated by desiring improved characteristics in cutting or anchoring screws in wood.[3]

In sum, the Court of International Trade defined self-tapping screws as simply improved forms of wood screws. But, that cannot be the only difference of these *eo nomine* provisions. The objective of an *eo nomine* designation is to capture all forms of the named article, even including articles that have "been improved or amplified but whose essential characteristic is preserved or only incidentally altered." *Casio*, 73 F.3d at 1098. Therefore, an *eo nomine* classification within HTSUS must capture all forms of a named good, including improvements that do not change the essential characteristic of the articles. Consequently, to be workable, HTSUS provisions must be defined distinctly enough to allow the classification of improved forms of goods—provided that such improvements are not fundamental changes. The use of goods may be an important aspect of the distinction of certain *eo nomine* provisions, in particular, where, as here, the name of the

---

[3]    The Court of International Trade also determined that self-tapping screws, unlike other wood screws, must be designed to pass performance requirements. It is not clear why wood screws generally would not be tested for their strength and ability to function in wood. Indeed, the advertising for GRK Model R4 screws shows data for the screws' performance in mating wood to wood. J.A. 408.

provisions refers directly to the use of subject articles. This is why, even within the context of the HTSUS, we should not be "so trusting of our own notions of what things are as to be willing to ignore the purpose for which they were designed and made and the use to which they were actually put." *Quon Quon*, 46 CCPA at 73.

The record is replete with evidence that the common commercial meanings of "other wood screws" and "self-tapping screws" include the materials with which the screws are intended and designed for use. While GRK's screws may be more difficult to characterize than conventional screw designs, there is no reason to make tariff classification more complicated by unduly ignoring such a critical factor at either step of the analysis—whether defining the legal meaning of the tariff terms at issue or determining the proper classification of the subject articles.

V

Accordingly, we vacate the Court of International Trade's findings and subsequent determination on the proper classification of the subject article, and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED**

# United States Court of Appeals
# for the Federal Circuit

---

**GRK CANADA, LTD.,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2013-1255

---

Appeal from the United States Court of International Trade in No. 09-CV-0390, Senior Judge Judith M. Barzilay.

---

REYNA, *Circuit Judge*, dissenting.

The majority holds that the Court of International Trade ("CIT") erred in refusing to consider intended and principal use to determine the common meaning of two *eo nomine* tariff classifications under the Harmonized Tariff Schedule of the United States ("HTSUS"). I do not agree that principal use should be considered in an *eo nomine* analysis. For this and other reasons set forth below, I respectfully *dissent*.

I

A foundational tenet of tariff classification law is that *eo nomine* provisions are distinct from use provisions and

do not depend on the principal or actual use of the imported merchandise in the United States.[1]  The majority recognizes that the two tariff subheadings at issue in this case—7318.12.00, "other wood screws," and 7318.14.10, "self-tapping screws"—are *eo nomine* provisions, not principal or actual use provisions.  The majority nevertheless imports a principal use analysis into its construction of the *eo nomine* subheadings by requiring consideration of the intended use of the named articles.  As a result, the majority conflates two very different categories of tariff classifications.  In holding that the CIT erred in failing to consider the intended or principal use of "other wood screws" and "self-tapping screws," the majority ignores a fundamental rule of interpretation of the harmonized tariff classification system.

The majority misunderstands the basic distinction between *eo nomine* provisions and use provisions.  An *eo nomine* provision describes an article by a specific name, not by use, and includes all forms of the named article.[2]  It is improper to import a use limitation into an *eo nomine* provision unless the name of the good inherently suggests a type of use.  *Carl Zeiss*, 195 F.3d at 1379.  A use provision, on the other hand, describes an article by its principal or actual use in the United States at the time of importation.  Use provisions are governed by the U.S. Additional Rules of Interpretation ("ARI"), and principal use is defined as the use that "exceeds any other single use" in the United States.  *Aromont*, 671 F.3d at 1312; ARI 1(a).

---

[1]  *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312 (Fed. Cir. 2012); *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).

[2]  *Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 645-46 (Fed. Cir. 2013); *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364-65 (Fed. Cir. 2011).

The majority faults the CIT for adhering to the distinction between *eo nomine* and use provisions and reads the CIT's decision as inferring that *any* consideration of use in an *eo nomine* analysis is prohibited:

> As an initial matter, our cases do not lead to the conclusion the Court of International Trade inferred that, under the HTSUS, once a provision is regarded as *eo nomine* because the heading describes goods by their names, use should in no respect be weighed in classifying subject articles.

Maj. Op. at 7. Yet, this is not what the CIT determined. To the contrary, the CIT correctly noted that "a use provision implicates a different analytical framework than does an *eo nomine* provision" and that a use limitation should not be read into an *eo nomine* provision unless inherent in the provision's common commercial meaning.[3] Far from holding that use can never be considered, the CIT concluded only that it "cannot support *this instance* of reading use into an *eo nomine* tariff provision under the HTSUS." *Id.* (emphasis added).

The majority further condemns the CIT's reliance on General Rule of Interpretation ("GRI") 3(c), implying that the CIT should have resorted to intended use to break the tie between the two subheadings. Maj. Op. at 11. The majority's approach ignores that we are bound to apply the GRIs as we would any other statute.[4] As we have often stated in our case law, the GRIs are the interpretive framework that govern tariff classifications.[5] The rules

---

[3]    *GRK Can., Ltd. v. United States*, 884 F. Supp. 2d 1340, 1353 (Ct. Int'l Trade 2013).

[4]    *BASF Corp. v. United States*, 482 F.3d 1324, 1325-26 (Fed. Cir. 2007).

[5]    *See, e.g.*, *BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011).

must be applied in numerical order, and each rule entails a different analysis and consideration of different factors. Indeed, GRI 3(c) exists for the very fact pattern in this case, in which the imported goods are *prima facie* classifiable under more than one heading or subheading. Stated differently, intended use does not become relevant to the *eo nomine* analysis just because an imported article satisfies more than one *eo nomine* classification. Hence, it is incorrect to fault the CIT for sequentially proceeding through the GRIs without identifying which rule should have applied.

The majority relies on *United States v. Quon Quon Company* for its argument that use may be of "paramount importance" in construing an *eo nomine* provision.[6] This reliance is misplaced. *Quon Quon* is a 50-year-old case from the Court of Customs and Patent Appeals ("CCPA") that was interpreting a provision of the old Tariff Schedule of the United States ("TSUS"). While the HTSUS is governed by the GRIs and ARIs, the TSUS operated under an entirely different set of interpretive rules, known as the General Headnotes and Rules of Interpretation.[7] We have held that prior TSUS cases are not binding on classifications made under the HTSUS.[8] Yet, even under the TSUS, consideration of use was generally precluded in construing *eo nomine* provisions.[9] The

---

[6]    Maj. Op. at 7 (citing *United States v. Quon Quon Co.*, 46 C.C.P.A. 70, 73 (1959)).

[7]    *See, e.g.*, *Robert Bosch Corp. v. United States*, 63 Cust. Ct. 187, 188-89 (1969).

[8]    *JVC Co. of Am. v. United States*, 234 F.3d 1348, 1355 (Fed. Cir. 2000).

[9]    *Pistorino & Co., Inc. v. United States*, 66 C.C.P.A. 95, 96 (1979) (noting that the "general rule precluding consideration of use in eo nomine designations applies here").

majority thus fails to base its analysis in the current interpretive framework—the GRIs; it also provides an inaccurate and incomplete analysis of the now-defunct TSUS framework.

The majority also relies on *CamelBak Products, LLC v. United States* for the proposition that the intended use of products may need to be considered even under the HTSUS.[10]  To be sure, *CamelBak* articulated a test to determine whether an additional component or function of an article, otherwise named by an *eo nomine* provision, substantially transforms the essential characteristic of the article such that it is no longer classifiable under the *eo nomine* provision.[11]  *CamelBak* allows use to be considered only within the context of the substantial transformation test, which addresses the identity of the imported article, and does not stand for the idea that use should be considered in defining the proper meaning of an *eo nomine* heading as a matter of law.  *CamelBak* cannot fairly be read to obscure the stark distinction between use provisions and *eo nomine* provisions.

Indeed, the majority's articulation of when use should be considered in an *eo nomine* analysis effectively converts *eo nomine* provisions into use provisions.  The majority states that *eo nomine* provisions may "require an analysis of the intended use of products," but does not explain when such an analysis is required or even how "intended use" differs from principal use as defined by ARI 1(a).  Maj. Op. at 8.  In fact, the majority asserts that consideration of use in defining an *eo nomine* provision

---

[10]    Maj. Op. at 8 (citing *CamelBak*, 649 F.3d at 1368-69).

[11]    *CamelBak*, 649 F.3d at 1367 (providing "several analytical tools or factors we can use to assess whether the subject articles are beyond the reach of the *eo nomine* backpack provision").

may require reaching the ARIs. Maj. Op. at 9 n.2. This conclusion is in direct conflict with our precedential classification cases, which are minimally addressed by the majority.[12] In *R.T. Foods, Inc. v. United States*, we rejected the importer's argument that the CIT should have performed a principle use analysis to define the *eo nomine* provision at issue, noting that a "'principle use' analysis is only used for those headings 'controlled by use,' as opposed to eo nomine headings."[13] Our prior law demonstrates that we have consistently cautioned against importing use limitations when defining the proper meaning of an *eo nomine* provision as a matter of law.[14] The majority fails to address this precedent in reaching its conclusion, which erases the clear distinction between *eo nomine* provisions and use provisions.

## II

The majority further errs by concluding that the common meaning of "other wood screws" and "self-tapping screws" inherently suggests a type of use. The majority first weighs that its own understanding of the term "other wood screws" inherently suggests intended use, even "without resort to any extrinsic authority." Maj. Op. at 10. But tariff classification is not patent claim construction, and "extrinsic authority" is often necessary in tariff classification cases to divine a term's common meaning.[15]

---

[12]  *See, e.g.*, *R.T. Foods, Inc. v. United States*, ---F.3d---, No. 2013-1188, 2014 WL 2981004 (Fed. Cir. July 3, 2014); *Link Snacks, Inc. v. United States*, 742 F.3d 962 (Fed. Cir. 2014); *Kahrs*, 713 F.3d 640; *Aromont*, 671 F.3d 1310; *BASF*, 482 F.3d 1324.

[13]  *R.T. Foods*, 2014 WL 2981004, at *4.

[14]  *Id.* (quoting *Kahrs*, 713 F.3d at 646).

[15]  *See, e.g.*, *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1356-57 (Fed. Cir. 2001) ("To ascertain the common meaning of a term, a court may consult dictionar-

While precedent allows us to rely to some extent on our own understanding of the term,[16] we cannot ignore objective evidence showing that the term's common meaning does not comport with our own unaided understanding.

The majority also relies on decisions of the U.S. Customs Court to support its conclusion that the name "wood screws" inherently suggests use.[17] These cases interpret a subheading of the old TSUS, titled "wood screws (including lag screws or bolts) of base metal." The U.S. Customs Court, however, preceded the CIT as the trial-level court for trade cases and is thus not binding precedent.[18] As noted above, the TSUS operated under a different set of interpretive rules,[19] and prior TSUS cases are not dispositive, although they may be helpful in interpreting identical language in the HTSUS.[20] Here, the relevant HTSUS language is far from identical to the old TSUS provisions. The TSUS subheading for "wood screws (including lag screws or bolts) of base metal" was changed to the six-digit subheading "other wood screws," and the HTSUS adopted a later six-digit subheading for "self-tapping screws." The addition of the term "other" in the "other wood screws" subheading indicates that it is now a residual provision designed to capture wood screws not specifi-

---

ies, scientific authorities, and other reliable information sources and lexicographic and other materials." (internal quotations omitted)).

[16] *See Len-Ron Mfg. Co. v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2009).

[17] *See* Maj. Op. at 11 (citing *Trans-Atl. Co. v. United States*, 68 Cust. Ct. 105, 108 (1972); *David Komisar & Son, Inc. v. United States*, 77 Cust. Ct. 88, 89 (1976)).

[18] *See Deckers Corp. v. United States*, 752 F.3d 949, 959 (Fed. Cir. 2014).

[19] *See, e.g.*, *Robert Bosch*, 63 Cust. Ct. at 188-89.

[20] *JVC Co.*, 234 F.3d at 1355.

cally classified elsewhere.[21]  Hence, the majority's reliance on 40-year-old precedent interpreting different classification terms is neither dispositive nor helpful.

The relevant industry and lexicographic sources define "other wood screws" and "self-tapping screws" in terms of their design characteristics and physical properties, not their principal or intended uses, as the majority suggests.  Consider the standards promulgated by the American National Standards Institute ("ANSI"), which provide detailed, multi-page specifications on the dimensions, length, thread, point, head, material, and other characteristics of wood screws and tapping screws.[22]  The CIT discussed in detail these standards, which state, among other things, that self-tapping screws are "case hardened to meet the performance requirements set forth in these specifications."  J.A. 643.  Had the majority also examined these standards, it would have seen that these characteristics are far from "relatively trivial changes," but instead speak to the very features that define each screw type.  Maj. Op. at 12.

The majority does consider the Glossary of Terms promulgated by the American Society of Mechanical Engineers ("ASME"), but it takes an isolated reading of these definitions to support its assertion that intended use must be considered.  The ASME Glossary of Terms defines a "tapping screw" and a "wood screw" as follows:

> 3.1.2.22 *tapping screw*:  has a slotted, recessed, or wrenching head and is designed to form or cut a

---

[21]    *See, e.g.*, *Deckers*, 752 F.3d at 951 (describing an "other" provision as applying to merchandise that cannot be "classified under a more specific subheading").

[22]    *See* J.A. 612-20 (ANSI B.18.6.1 describing "wood screws"); J.A. 621-48 (ANSI B.18.6.4 describing "thread-cutting and thread-forming tapping screws").

mating thread in one or more of the parts to be assembled. Tapping screws are generally available in various combinations of the following head and screw styles: fillister, flat, flat trim, hexagon, hexagon washer, oval, oval trim, pan, round, and truss head styles with thread-forming screws, Types A, B, BA, BP, and C, or thread cutting screws, Types D, F, G, T, BF, BG, and BT as illustrated and described below.

\* \* \* \*

3.1.2.30 *wood screw*: a thread forming screw having a slotted or recessed head, gimlet point, and a sharp crested, coarse pitch thread, and generally available with flat, oval, and round head styles. It is designed to produce a mating thread when assembled into wood or other resilient materials.

J.A. 660, 662. The majority fails to address the detailed descriptions provided by these definitions, which outline the head, point, and threading of each screw type, and instead chooses to latch onto the definitions' statements about the function and capabilities of the screws as evidence that intended use must be considered. Maj. Op. at 10-11. These statements, however, do not by themselves implicate a principal or intended use analysis. Describing a named article by function or capability is not the same as limiting the *eo nomine* provision to that article's principal or intended use in the United States marketplace.

The majority commits similar error in its analysis of the Explanatory Notes for heading 7318, which are published by the World Customs Organization and provide non-binding interpretive guidance. *Kahrs Int'l*, 713 F.3d at 644-45. While the majority asserts that the Explanatory Notes "expressly reference materials in which the screws are to be used," the majority reads too much into the Notes by concluding that these references require consideration of intended use. Maj. Op. at 10. The major-

ity argues that the term "screws for wood" implies intended use but ignores that the Explanatory Notes actually describe wood screws in terms of their physical characteristics—*i.e.*, they are "tapered and pointed, and they have a steeper cutting thread since they have to bite their own way into the material." J.A. 710.

The majority also relies on the Explanatory Notes' statement that self-tapping screws can "cut their own passage into thin sheets of metal, marble, slate, plastics, etc." J.A. 710. As the CIT noted, however, this statement is not a clear limitation of the subheading's scope, but instead provides a non-exhaustive list of various materials into which self-tapping screws can cut their own passage. Examples in the Explanatory Notes are illustrative and do not provide a valid basis for limiting the scope of the subheadings themselves.[23]

Finally, Customs' own publications and prior practice support construing the subheadings for "other wood screws" and "self-tapping screws" in terms of physical properties and design characteristics, not principal or intended use. Customs' policy since 1995 has been that the most "objectively verifiable standard" for differentiating between threaded fasteners is to employ industry dimensional standards.[24] If a fastener did not fit squarely into a recognized standard, Customs applied the closest conforming standard, and if none existed, it would consider the majority of the fastener's "design characteristics."[25] Hence, Customs has traditionally classified fasteners

---

[23] *Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1359 (Fed. Cir. 2003).

[24] Headquarters Ruling Letter 956811 (Apr. 14, 1995).

[25] Headquarters Ruling Letter 967919 (Jan. 24, 2006).

under heading 7314 according to their physical properties and design characteristics, not intended use.

### III

In sum, the majority unnecessarily confuses the tariff classification analysis by requiring the CIT to consider intended use when construing the *eo nomine* subheadings. The majority blurs the boundaries between *eo nomine* and principal use provisions in ways that will promote confusion and error in future classification cases. For these reasons, I *dissent*.